230 F.2d 855
 108 U.S.P.Q. 383
 COLGATE-PALMOLIVE COMPANY, Stalfort Pressure-Pak
Corporation, John C. Stalfort & Sons, Inc., and
Read Drug & Chemical Company, Inc., Appellants,
v.
CARTER PRODUCTS, Inc., Joseph G. Spitzer and Marvin Small, Appellees.
 No. 7075.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 11, 1955.
Decided March 8, 1956.
 
 John T. Cahill, New York City (Benjamin B. Schneider, New York City, H. Vernon Eney, Baltimore, Md., H. Walter Reynolds, New York City, Trenton Meredith, Jersey City, N.J., Thomas C. Mason, New York City, H. Paul Rome, H. Ross Black, Jr., and Venable, Baetjer & Howard, Baltimore, Md., on the brief), for appellants.
 George B. Finnegan, Jr., New York City (William L. Hanaway, New York City, William D. Denson, Washington, D.C., Jerome G. Lee and Morris Kirschstein, New York City, on the brief), for appellees.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 PARKER, Chief Judge.
 
 
 1
 This is an appeal in a case involving patent infringement and appropriation of trade secrets. The patent in suit is United States Patent No. 2,655,480 issued October 13, 1953 to one Spitzer and others relating to a pressurized shaving cream. The plaintiffs in the court below, appellees here, were Spitzer and his partner Small, holders by assignment from the other patentees, and Carter Products Inc., manufacturer of drugs and cosmetics and the holder of an exclusive license under the patent. The defendants below, appellants here, were the Colgate-Palmolive Company, the manufacturer of a pressurized shaving cream alleged to infringe, the Stalfort Pressure-Pak Corporation and John C. Stalfort & Sons, Inc., who packaged pressurized shaving cream alleged to infringe the patent for the Mennen Company, and the Read Drug & Chemical Company, Inc., which sold the pressurized shaving cream for Colgate and Mennen. Plaintiffs claimed infringement of only eight claims of the patent. Defendants admitted infringement if these claims were valid but denied their validity and asked judgment declaring them as well as all other claims of the patent invalid.
 
 
 2
 The trial court held the patent valid, and enjoined infringement thereof as well as the use of a trade secret held to have been wrongfully appropriated by Colgate. It also ordered Colgate to assign to plaintiffs rights under patent applications found to have been based upon the trade secret. The case was referred to a special master to determine and report as to damages resulting from infringement and also as to damages and profits for which Colgate should be required to account because of misappropriation of trade secrets and to make recommendations as to whether the damages on account of patent infringement should be increased as allowed by statute, reserving, however, for future determination the question as to whether increased damages should be awarded. Judgment was entered that plaintiffs recover their costs and taxable disbursements to date, including against Colgate reasonable attorneys' fees, and the special master was directed to include in his report a recommendation as to the amount of attorneys' fees to be allowed. Three principal questions are presented by the appeal: (1) Is the patent valid? (2) Should the findings of the trial court as to misappropriation of trade secrets be sustained? And (3) Is the decree proper?
 
 
 3
 1. The Validity of the Patent.
 
 
 4
 Spitzer, one of the patentees, in the year 1948 conceived the idea of developing a shaving lather which, like the lather produced by machines in barber shops, could be used as it came from the container without being worked up on the face. He employed Foster D. Snell, Inc., consulting chemists, to work out his idea for him in terms of a mixture that could be enclosed in a small container and, upon the opening of a valve, would emerge in the form of a durable lather, which, without whipping up or other agitation, could be used for shaving purposes. Snell put to work on the project two chemists, Reich and Fine, who after several months of work and experimentation developed an emulsion consisting of an aqueous soap solution mixed with certain gases liquefied by pressure, which they enclosed in a container. When the valve of the container was opened the pressure of the gases extruded the emulsion and, as it came from the can, the particles of gas expended into minute bubbles covered with soap which was the shaving lather desired. Patent, applied for November 2, 1949, was issued to Spitzer, Reich and Fine October 13, 1953. In the meantime an exclusive license had been granted to Carter and the product was being marketed under the trade name of 'Rise'. It achieved at once outstanding commercial success. Sales of 'Rise' in 1950 amounted to $400,000, in 1951 to $800,000, in 1952 to $1,800,000 and in 1953 to $2,600,000. The sales of Colgate's infringing product in 1954 amounted to $5,000,000.
 
 
 5
 There was, of course, nothing novel in the use of soap to make lather, nor in the use of a can as a container, not in the use of a gas liquefied by pressure and mixed with another liquid to spray the mixture from the can. What was novel was to get a mixture of the right gases, with the right soaps in the right proportions, confined in a container under the right pressure, so that a lather satisfactory for shaving purposes would be produced when the mixture was allowed to emerge. In producing such a mixture many problems were encountered and the record shows that their solution took many months. The first experiment consisted in mixing a liquid soap then on the market with nitrous oxide gas, the gas used with pressurized whipped cream This was a failure because the gas was soluble in the aqueous soap solution and the product extruded from the container was not a lather useful for shaving but a mere soapy liquid. An emulsion consisting of the gas propellant Freon-12 (dichlordifluormethane) and the soap solution used in barber shop machines would not do because the pressure was too high. Reduction of the vapor pressure by mixing Freon-11 (monofluortrichlormethane) with Freon-12 produced a smarting, skin-irritating product not suitable for shaving. Reduction of vapor pressure with mineral oil solved the pressure problem but produced problems in connection with the soaps. Finally, after much experimentation, sodium soaps were eliminated and the soap solution adopted was a combination of 80 parts of TEA (triethanolamine) stearate and 20 parts of TEA cocoate, to prevent jelling. The proper propellant was found after much inquiry and experiment by mixing Freon-114 (1, 2 dichlor 1, 1, 2, 2 tetrafluorethane) with Freon-12. The trial judge summarized the matter as follows:
 
 
 6
 'Precisely what is this new combination? The individual ingredients of the shaving soap solutions embraced in the Spitzer patent were old in the art. So were the Freons. Also, Freons had previously been used successfully as propellants in aerosols and insecticides. In other words, the combination of some Freons with the Spitzer soap solutions was not new in the art. But the combination of an aqueous soap solution, emulsified in the liquid base with a Freon which had not only low water solubility but which combined the properties of (1) not smarting or burning the face, and (2) good, stable lather, was unknown. There were a number of Freons used in the propellant art which did not smart or burn the face, but they did not afford a good stable lather. Conversely, there were those Freons that were known to give a satisfactory lather but they were disagreeable on the skin. It is this combination of a relatively small group of Freons, that manifest those desirable properties of low water solubility and the optimum characteristics of non-smarting and of lather quality, with aqueous soap solutions that constitutes the invention of Spitzer and his associates. They discovered that all three of these characteristics were inter-related. They found that Freons having a solubility in water not exceeding about 32 cc. of gas to 100 grams of water to be the type of Freons productive of the optimum of the other two qualities desired in the lather composition. This is what the specifications of the Spitzer patent teach, and all 8 of the claims in suit are responsive to this teaching. Claims 6 and 9 are limited to the use of Freon-114. Claims 8 and 10 are limited to the use of Freon-12. Claims 18 and 20, which are based upon claim 16 as a parent claim, prescribe the use of any one of a group of five Freons, including 12 and 114. Claims 8 (based on claim 2) and 15 embrace the use of a broader group of Freons, but in this group also are only Freons that are essentially non-smarting to the face, and stable in lather forming. In fact, the entire 21 claims of the patent are so limited.'
 
 
 7
 The invention is thus described in the specification:
 
 
 8
 'In general, the above and other objects of the invention are carried out by employing a composition comprising a water solution of a suitable soap or like detergent and a highly volatile organic liquid, hereinafter generally termed a propellant. At least a substantial proportion of the propellant used in the mixture is insoluble in the soap solution and the two primary ingredients are mixed and maintained under sufficient pressure so that the insoluble portion of the propellant is in liquid phase, existing as droplets or in the form of a liquid-liquid emulsion in the soap solution. The mixed primary ingredients are confined at the vapor pressure of the propellant in a pressure-tight container having an opening controlled by a suitable manually operable valve. When the valve is opened, the pressure on the composition is released as it emerges from the container, with the result that a fine textured creamy lather is produced. The action is apparently such that the volatile propellant liquid, entrapped as an emulsion within the liquid soap solution vaporizes upon the release of pressure therefrom, forming fine gas cells throughout the liquid soap solution and thus forming it into a lather.'
 
 
 9
 Of the claims in suit, claims 2, 6, 10, 16 and 20, may be taken as typical. They are as follows:
 
 
 10
 '2. A package comprising a pressure-tight container having a valve-controlled opening and containing a composition for use in producing a stable lather consisting essentially of a liquid mixture of an aqueous soap solution and a volatile propellant in liquid phase, the composition being confined in the container under the vapor pressure of the propellant, said soap solution comprising a solution which is non-gelling at room temperatures and which contains at least about 5% and not substantially exceeding about 30% by weight of soap, a substantial proportion of the soap in said soap solution comprising at least one soap selected from the group consisting of the soaps of potassium, sodium and the water soluble aliphatic amines, said propellant being a halogenated alkane having nor more than two carbon atoms and containing at least one fluorine atom, the atomic weight of each substituted halogen atom not exceeding 36, the proportion of propellant being from about 0.2 to about 0.0125 mole per 100 grams of the composition, said propellant having a vapor pressure in the range from about 5 to 300 pounds per square inch gauge at 70 degrees F and having a solubility in water not exceeding about 32 cc. of gas to 100 grams of water at atmospheric pressure and 25 degrees C.
 
 
 11
 '6. A package according to claim 2, in which a substantial proportion of the soap in the soap solution comprises triethanolamine stearate and the propellant comprises 1, 2 dichlor 1, 1, 2, 2 tetrafluorethane.
 
 
 12
 '10. A package according to claim 2, in which the soap in the soap solution comprises at least 30% triethanolamine stearate and the propellant comprises dichlordifluormethane.
 
 
 13
 '16. A package comprising a pressure-tight container having a valve-controlled opening and containing a composition for use in producing a stable lather consisting essentially of a liquid mixture of an aqueous soap solution and a volatile propellant in liquid phase, the composition being confined in the container under the vapor pressure of the propellant, said soap solution comprising a solution which is non-gelling at room temperatures and which contains from about 5% to about 18% by weight of soap, said propellant comprising at least one compound selected from the group consisting of the substantially water-insoluble fluorinated-chlorinated ethanes and methanes in which all of the hydrogen atoms are replaced by chlorine and fluorine and in which the number of fluorine atoms in the molecule at least equals the number of chlorine atoms, the proportion of propellant being from about .07 to about .25 mole per 100 grams of the composition, said propellant having a vapor pressure in the range of from about 15 to about 65 pounds per square inch gauge at 70 degrees F.
 
 
 14
 '20. A package according to claim 16 in which the propellant consists of a mixture of dichlordifluormethane and 1, 2 dichlor 1, 1, 2, 2 tetrafluorethane and in which the soap in the soap solution comprises a higher saturated fatty acid triethanolamine soap and includes a lesser proportion of sodium soap.'
 
 
 15
 The defendant Colgate-Palmolive became interested in a pressurized shaving cream when 'Rise' came on the market; but although it had 200 or more chemists in its service and although it purchased packages of 'Rise' and had them analyzed, the record shows that it was unable to develop a satisfactory product until it had employed Fine, who had been working for Snell in the development of 'Rise'. He gave Colgate the formula which brought success to its efforts and which embodied the formula of 'Rise' in combination with a formula which Colgate had theretofore not found successful. He gave Colgate, also, the benefit of knowledge obtained at Snell's with respect to improving the 'Rise' formula by superfatting so as to produce a smoother lather and one which gives the feeling on the skin produced by the so-called brushless shaving creams. Colgate had Fine to file applications for patents covering this improved lather. Notwithstanding this experience and attempts to obtain patents in its own behalf on the subject matter, Colgate argues that the patent here in suit is lacking in invention and is anticipated by both domestic and foreign patents and by prior use.
 
 
 16
 The three domestic patents relied on as anticipations were all considered by the Patent Office before granting the patent. They are Rotheim No. 1,892,750 of 1937, Getz No. 2,294,172 of 1948 and Boe No. 2,524,590 of 1950. We agree with the trial judge that none of these anticipates and that taken together they do not negative invention in the patent in suit. Rotheim relates to a method of atomizing materials of a liquid or semi-liquid consistency. Liquid soap is given as one of the materials that may be atomized. No Freons are listed as propellants. Getz is a patent for aerating food products such as whipped cream, where a solution and not an emulsion is what is desired. Its only possible relevancy is that it lists among the propellants Freon-12, which has long been used as a propellant of insecticides. Boe relates to spraying. While it lists Freons, among other gases, as propellants and suggests that the gases listed may be mixed to arrive at a desirable vapor pressure, it does not specify which gases. It does not suggest the creation of a lather, but points out how foaming may be prevented.
 
 
 17
 Foreign patents relied on by defendants were the Belgian Patent to Estignard-Bluard of 1949 and Argentine and Panama patents to Daggett & Ramsdell of 1946. These patents were excluded on legal grounds by the trial court, the Belgian patent on the ground that although the patent was granted by decree prior to the conception date of the invention involved in the patent in suit, it was not opened to the public until after that date, the Argentine and Panama patents on the ground that only the claims of the patent could be considered and these were irrelevant. Assuming without deciding that there was error in the exclusion of these patents, the position of defendants is not helped, since neither of these teaches how to produce the pressurized shaving cream of the patent in suit. The Belgian patent relates to the formation of pressurized gaseous emulsions and lists a large number of gaseous propellants, but not including Freon-114, with all sorts of liquids to be used therewith including soaps as emulsifying agents only. It suggests the problem of developing a pressurized shaving cream but does not teach which of the propellants should be used for that purpose or with what combination of soaps they should be used. The Argentine and Panama patents relate to spraying cosmetics and, while formulas for shaving creams are included among the cosmetics to be sprayed, none of these formulas would aid in solving the problem which was solved by the patent in suit. They merely list 'propellants' without indicating what mixture of propellants is to be used with what mixture of soaps.
 
 
 18
 Defendants rely upon prior use by Gebauer and Segelken. Gebauer developed a shampoo which jelled and which used Freon-11 as a propellant. It manifestly did not anticipate nor suggest the pressurized shaving cream of the patent. Segelken was the chemist employed by Daggett-Ramsdell upon whose experiments the Argentine and Panama patents were obtained. While he testifies that in the course of his experiments he produced a satisfactory pressurized shaving cream, it is not shown that he used the combination either of propellants or soaps prescribed by the patent or that he eliminated objectionable matters eliminated by that combination or achieved the results obtained by it. The evidence relied upon falls far short of the sort of evidence necessary to invalidate a patent by oral evidence of prior use. See the Barbed Wire Patent, Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co., 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Adamson v. Gilliland, 242 U.S. 350, 37 S.Ct. 169, 61 L.Ed. 356; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923.
 
 
 19
 The real question as to the validity of the patent is not one of anticipation or of prior use but of invention. The question is whether the product of the patent is mere aggregation, in which old elements accomplish independently what they did in the prior art, or whether there is a true combination in which old elements have been combined to produce a new and useful result. We think that the latter is the case. What we have is not the mere use of propellant gases to extrude shaving soap from a container. But the use of particular propellant gases liquefied under pressure and combined in such way with particular aqueous soap solutions as to produce an emulsion, which, when released from the container, becomes a lather composed of tiny gas bubbles coated with soap and useful for shaving-- a product which was new and useful, which the expert chemists of Colgate had tried unsuccessfully to produce, and which achieved at once unqualified commercial success.
 
 
 20
 A sufficient answer to the argument that nothing more is involved than the skill of the art is that the patentees experimented for months in the effort to produce the pressurized shaving cream of the patent before their efforts finally resulted in success, that Colgate's efforts to produce it proved unsuccessful and that, after it had been produced and Colgate had purchased it on the market and had it analyzed, Colgate's corps of expert chemists were still not able to produce it until the knowledge of one of the patentees was availed of. As said by Mr. Justice McKenna in the Grant Tire case, Diamond Rubber Tire Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, 'Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration.'
 
 
 21
 That the product of the patent is a true combination and not a mere aggregation clearly follows from the application of the principles approved and applied by this court in the Canned Heat Patent case, which is very much in point here. United States Industrial Chemical Co. v. Theroz Co., 4 Cir., 25 F.2d 387, 391. In that case we quoted with approval the following passage from 20 R.C.L. 1125-1126, which we understand to be a correct statement of the principles of law here applicable, viz.:
 
 
 22
 "A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. The authorities establish the following propositions respecting the patentability of devices or processes of this character: (1) That a combination is patentable if it produces new and useful results, though all its constituents were well known and in common use before it was made, provided the results are a product of the combination, and not a mere aggregate of several results, each the product of one of the combined elements. (2) If it produces a different force, effect, or result in the combined forces or processes from that given by their separate parts, and a new result is given by their union. (3) If it either forms a new machine of distinct character or formation, or produces a result which is not the mere aggregate of separate contributions, but is due to the joint and co-operating action of all the elements. (4) When the several elements of which it is composed produce by their joint action either a new and useful result, or an old result in a cheaper or otherwise more advantageous way."
 
 
 23
 The patentability of 'Rise' is supported by every criterion here laid down. First it produces a new and useful result, and this result is a product of the combination, and not the mere aggregate of several results; second, it produces a different result in the combined forces or processes from that given by their separate parts, and a new result is given by their union; third, it produces a result which is not the mere aggregate of separate contributions, but is due to the joint and cooperating action of all the elements; and, fourth, the several elements of which the product is composed produce by their joint action a new and useful result.
 
 
 24
 The case presented is thus fundamentally different from Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12, where all that was done was to use a drug with a cosmetic preparation to accomplish a purpose for which its availability had long been known and recognized. What we have here is a new and useful composition of matter produced after lengthy experimentation, in which the various elements combine to produce a new and useful result. To the presumption that the finding of the District Judge as to validity is correct, a finding based upon lengthy evidence and the testimony of experts. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, must be added the presumptions of validity arising from the fact that the patent was issued by the Patent Office, from the fact that the patented product entered at once into wide public use and achieved outstanding commercial success, and from the fact that it was copied by an infringer who was one of the largest soap manufacturers of the country and who had been trying in vain to develop a similar product but had been unable to do so until the knowledge of one of the patentees was obtained.
 
 
 25
 2. The Trade Secrets.
 
 
 26
 The District Judge made the following finding as to misappropriation of trade secrets by Colgate, viz.:
 
 
 27
 '12. That the defendant Colgate-Palmolive Company has wrongfully and unlawfully misappropriated trade secrets of plaintiff by embodying them in pressurized lather shaving compositions as follows:
 
 
 28
 '(a) By combining the trade secret of the formula of the soap solution in the plaintiffs' product 'Rise' with diluted Colgate lather cream to make 'Rapid Shave No. 1'.
 
 
 29
 '(b) By employing in some containers of 'Rapid Shave No. 1' plaintiffs' trade secret in the heat annealing process for polyethylene siphon tubes.
 
 
 30
 '(c) By combining in a pressurized lather-generating composition a soap solution superfatted with petrolatum, carbowax and excess stearic acid, and embodying said secret combination in its products 'Rapid Shave No. 2' and 'Instant Barber Shave'.
 
 
 31
 'The above-described trade secret of sub-paragraph (c) was not disclosed or claimed in plaintiffs' United States Letters Patent No. 2,655,480, in suit.'
 
 
 32
 In his opinion the District Judge set forth the facts and chronology upon which the foregoing findings were based as follows (130 F.Supp. 573):
 
 
 33
 'We find to be correct, by the weight of the credible evidence, the following chronology of what occurred from the beginning of the development of 'Rise' to the institution of the present suit: March, 1949: Spitzer, Reich and Fine began their research and development work, April, 1950: Carter put 'Rise' on the market. May and July, 1950: Colgate analyzed 'Rise,' and endeavored, unsuccessfully, to duplicate it, although claiming that the 'Rise' formula had been completely reproduced but was not found satisfactory, particularly because it did not result in sufficient exhaustion of the product from the can. Also, Colgate was troubled with sputtering of the product. September, 1950: Fine entered the employment of Colgate although he had been a co-inventor of 'Rise'. October, 1950: Fine revealed to Colgate the causes of the sputtering. November 1950: Fine disclosed to Colgate the precise formula of 'Rise', and also combined that formula with diluted Colgate lather, to make Rapid-Shave No. 1. Further, he disclosed to Colgate, and to the latter's supplier of valves, the siphon tube annealing process employed by Carter for 'Rise'. August, 1951: Colgate filed in Fine's name a patent application covering the formula of Rapid-Shave No. 1, which embodied his work originally done on 'Rise'. November, 1951: Fine prepared, and disclosed to Hansen, his assistant at Colgate, a duplicate formula for 'Rise', superfatted, i.e., with excess of fatty matter (soap). September, 1952, until February, 1953: Colgate pursued its experimentation in superfatting the 'Rise' formula with petrolatum, carbowax and excess stearic acid, and then marketed its Rapid-Shave No. 2. September 1953: Colgate filed its second patent application in the name of Fine and associates, based on the development work that Fine had done while employed by Snell.'
 
 
 34
 We agree with the District Judge that Colgate must be held to liability for the appropriation and use of the 'Rise' formula in developing its shaving cream. That formula had been developed in the confidential work of Snell for Spitzer. Fine as an employee of Snell was under contract with Snell not to disclose information obtained in the course of this work. Colgate knew of Fine's employment and of his work on the development of 'rise', which Colgate had been unable to produce even after purchasing it on the market and having it analyzed. Although Colgate had twice before this refused to employ Fine, and although it knew of the confidential nature of his employment with Snell, it proceeded to employ him while it was engaged in the effort to develop a pressurized shaving cream and, within a month of his employment, put him to work on the problem, which he solved immediately by using the 'Rise' formula in combination with a formula which Colgate had found unsuccessful.
 
 
 35
 With respect to the superfatting, it appears that this was worked out at Snell's to give the lather a 'brushless effect' after the patent in suit had been applied for. It also appears that Fine, who had developed the superfatting process in the course of his work at Snell's, suggested it to Colgate and that Colgate adopted the process and caused an application for a patent covering it to be filed by Fine.
 
 
 36
 On these facts, there can be no question but that Colgate used the knowledge of Fine in producing its pressurized shaving cream or that this knowledge related to matters which were trade secrets of Spitzer and his associates. That Colgate did not enter into an open bargain with Fine to disclose this confidential information is no defense. Nor is it a defense that Fine upon his employment was entitled to use his skill in Colgate's interest. He was not entitled to give to Colgate the benefit of business secrets which had been disclosed to him at Snell's; and Colgate could not close its eyes to facts which clearly indicated that this was what he was doing, even if he had not been employed for that express purpose. One may not escape liability for appropriating the business secrets of another by employing one who has been entrusted with the secrets and permitting him to make use of them. With respect to this the District Judge said:
 
 
 37
 '* * * it is not necessary to, nor do we find that Colgate's employment of Fine was originally arranged for the specific purpose of having him divulge confidential information about the 'rise' patent that he had acquired at Snell's. The basis of our decision that Colgate's action was wrongful is that Colgate knew, or must have known by the exercise of fair business principles, that the precise character of Fine's work with Snell was, in all likelihood, covered by the agreement which Fine had with Snell not to divulge trade secrets, and that, therefore, Colgate was obligated to do more than it did towards ascertaining the extent to which Fine was, in fact, restricted in what he might disclose to Colgate. That it was wrong for Colgate not to go further than it did in this respect is confirmed by the very status of Fine when he came to Colgate. At that time Fine was a joint inventor and patentee of 'Rise.' In other words, Fine was willing to be, and was knowingly placed by Colgate in work that was in direct competition with the work in which Fine had shared at Snell's, resulting ultimately in his own patent. The very fact that Fine would do this should, per se, have raised in the minds of the representatives of Colgate, who arranged the employment of Fine, a feeling that he was entering upon a rather strange employment under the circumstances. It, therefore, was not enough for Colgate to say that they would see that Fine lived up to the limitations imposed by his contract with Snell. The weight of the credible evidence discloses that Colgate was far from being sufficiently avid to ascertain what those limitations really were, and to have Fine live up to them.'
 
 
 38
 The principles of law applicable are well settled and are well stated in section 757 of the A.L.I. Restatement of Torts as follows:
 
 
 39
 'One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
 
 
 40
 '(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, * * *.'
 
 
 41
 Directly in point in support of the proposition thus stated are Peabody v. Norfolk, 98 Mass. 452, 96 Am.Dec. 664 (opinion by Gray, J.); Nulomoline v. Stromeyer, 3 Cir., 249 F. 597; Herold v. Herold China & Pottery Co., 6 Cir., 257 F. 911; A. O. Smith Corp. v. Petroleum Iron Works of Ohio, 6 Cir., 73 F.2d 531, 539; Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 207 F.2d 912, 921; Seismograph Service Corp. v. Offshore Raydist, D.C.E.D.La., 135 F.Supp. 342, 354; Lamont C. & Co. v. Bonnie Blend Chocolate Corp., 135 Misc. 537, 238 N.Y.S. 78. See also Smith v. Dravo Corp., 7 Cir., 203 F.2d 369, 375; Franke v. Wiltschek, 2 Cir., 209 F.2d 493, 495. Nulomoline v. Stromeyer, supra, was a case in which the appropriation of the trade secret resulted, as here, from the employment of one to whom it had been imparted in the course of a former employment. In Herold v. Herold China & Pottery Co., supra (257 F. 913), Judge Knappen, speaking for the Court of Appeals of the Sixth Circuit, stated the rule as follows:
 
 
 42
 'The rule is well settled that secret formulas and processes, such as are claimed to be involved here, are property rights which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts express or implied, but as against those who are participating in such attempt with knowledge of such confidential relations or contract, though they might in time have reached the same result by their own independent experiments or efforts.'
 
 
 43
 We do not think that the finding, 12(b), with respect to the annealing of the polyethylene tubes by dipping them in hot water can be sustained. While Fine learned of this at Snell's and communicated his knowledge to Colgate, the process was one which was well known and cannot be treated as a trade secret or a confidential disclosure. American Potato Dryers v. Peters, 4 Cir., 184 F.2d 165, 172; A.L.I. Restatement of Torts, sec. 757, Comment (b) pp. 5-6. This, however, is not material since no injunctive relief is granted with respect thereto and the damages, whether based on the use of the original 'Rise' formula or the superfatted formula, would not be affected thereby.
 
 
 44
 3. The Decree.
 
 
 45
 Decree was properly entered enjoining infringement of the patent and awarding damages because of infringement, and, as to Colgate, awarding damages from the time that this defendant began using the trade secrets which it had obtained by the employment of Fine. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 922, 923; Chesapeake & O.R. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801, 806; Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642, 645. The decree properly ordered that all rights under the patent applications filed by Fine at Colgate's direction be assigned to plaintiffs. Without intimating any opinion as to whether patent should issue on these applications, we think it clear that, if patents should issue, all rights therein, in equity and good conscience, belong to plaintiffs, since the discovery or invention involved was made by Fine while employed for the purpose of making it. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560; Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752; Houghton v. United States, 4 Cir., 23 F.2d 386, 388; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, 86; Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623.
 
 
 46
 Question is raised as to the awarding of attorneys' fees against Colgate under 35 U.S.C. § 285; but this was a matter resting in the sound discretion of the trial court and we cannot say that the discretion was abused. Orrison v. C. Hoffberger Co., 4 Cir., 190 F.2d 787, 791; Aeration Processes, Inc., v. Walter Kidde & Co., 2 Cir., 177 F.2d 772; Pacific Contact Laboratories, Inc., v. Solex Laboratories, 9 Cir., 209 F.2d 529, 533. This is not an ordinary case of infringement. It is a case of deliberate and wilful infringement based upon and made possible by appropriation of trade secrets upon the basis of which Colgate has itself attempted to obtain a patent. The court below has termed the defense 'specious'. Whether 'specious' or not, the circumstances were certainly sufficient to make this an 'exceptional' case within the meaning of the statute, the purpose of which was to give the court power to throw the burden of unnecessary and vexatious litigation on the shoulders of those who are responsible for it.
 
 
 47
 Other questions raised by the appeal warrant but scant mention. It is urged that there was error in refusing to require plaintiffs to furnish to defendants the correspondence passing between plaintiffs' agents and counsel with reference to the Rotheim patent when it was being considered by the Patent Office in connection with the patent in suit. The motion was denied on the ground that it involved privileged communications of counsel, but the correspondence was proffered for examination by the court. Aside from the question of privilege, it is a matter resting in the discretion of the court as to how far parties should be allowed to go in a fishing expedition of this sort; and there is nothing to show that the discretion was abused or that there was anything in connection with this correspondence which would warrant our sending the case back for rehearing. The same may be said as to the action of the court in holding the parties to the trial of the issues involved in the case and in excluding evidence offered with respect to the use of propellants in the art relating to insecticides. Complaint is made that the trial judge was impatient with counsel, but an examination of the record shows that he tried the case carefully and with a great deal more patience than most judges would have exercised under similar circumstances. He gave six weeks to a case which should have been tried in a much shorter period, and at its conclusion counsel for defendants expressed their appreciation of the patience which he had exhibited throughout the trial.
 
 
 48
 The decree appealed from will be affirmed.
 
 
 49
 Affirmed.