**ROBINTECH, INC., Plaintiff,**

v.

**CHEMIDUS WAVIN, LTD., Defendant.**

**Civ. A. No. 76–0613.**

United States District Court,
District of Columbia,
Civil Division.

May 10, 1978.

David S. Abrams, Washington, D. C., for plaintiff.

A. Robert Theibault, Arlington, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

### Findings of Fact

I. *Nature of the Litigation and the Parties Thereto.*

1. This is a declaratory judgment action under 28 U.S.C. § 2201 and § 2202 brought by plaintiff, Robintech, Inc. (hereinafter "Robintech"), against defendant, Chemidus Wavin, Ltd. (formerly known as Chemidus Plastics, Ltd., hereinafter "Chemidus"), alleging invalidity and unenforceability of the claims of United States Letters Patent No. 3,484,900 (plaintiff's trial exhibit No. 1, hereinafter "PX–1") for an "apparatus and method" for forming a circumferential internal groove on a length of piping of tubular thermoplastics material. An actual controversy exists between the parties, and jurisdiction and venue exist under 28 U.S.C. § 1338(a), § 1400, and the patent laws of the United States including 35 U.S.C. § 293. The issue of patent infringement is not before the Court in this action.

2. Plaintiff Robintech is a Delaware corporation having its principal place of business at 1407 Texas Street, Fort Worth, Texas.

3. Defendant Chemidus is a British corporation, having its principal place of business at Rigby Lane, Dawley Road, Hayes, Middlesex UB31E4, England, and is the owner of U. S. Letters Patent No. 3,484,900 which issued on December 23, 1969, in the name of David Harold Sands and Ronald Broome as joint inventors of the claimed apparatus (hereinafter "Sands-Broome U. S. patent"). (Sparrow testimony Trial Transcript p. 294, hereinafter "Sparrow Tr. 294").[1]

4. The Sands-Broome U. S. patent is the subject of a license agreement between the parties hereto (PX–30), which agreement is presently the subject of an arbitration proceeding between the parties in London, England. Both parties have filed counterclaims in the present action regarding liability under the license agreement. However, the trial was directed to the question of validity and enforceability of the Sands-Broome U. S. patent.

5. The issues presented at trial relating to validity of the patent are whether the Sands-Broome U. S. patent is invalid because:

(a) the claimed subject matter would have been obvious under 35 U.S.C. § 103;

(b) the patent fails to set forth the "best mode" in conformance with 35 U.S.C. § 112; and

(c) of nonjoinder of an inventor per 35 U.S.C. § 102(f).

The issue relating to nonjoinder of an inventor was covered by the Court's Memorandum Order of March 22, 1978, and is not treated herein.

6. The issues presented regarding unenforceability of the Sands-Broome U. S. patent under 35 U.S.C. § 282(1) are whether the patent has been misused because an Agreement between the parties contains:

(a) a "no-contest" clause;

(b) a "grantback" clause; and

(c) a clause restricting exports.

7. The issues relating to patent misuse are the subject of another Memorandum Order of the Court, also dated March 22, 1978. Such issues are therefore outside the scope of the present Findings and Conclusions which concern only the validity of the Sands-Broome U. S. patent.

---

1. Basil H. G. Sparrow is Director and Secretary of Chemidus Wavin, Ltd.

II. *The Sands-Broome U. S. Patent in Suit.*

8. The Sands-Broome U. S. patent describes an "apparatus and method" for forming a groove in a length of thermoplastic pipe by inserting a device (termed a "mandrel") into the end of a heated portion of thermoplastic pipe and radially expanding, i. e., outwardly in a direction perpendicular to the axis of the pipe (Wiley Tr. 34),[2] a radially expandable ring means outwardly so as to force the heated pipe into a split cavity mold, forming a groove in the pipe. The radially expandable ring means then retracts from the freshly formed groove, and the mandrel can now be withdrawn from the pipe. (Wiley Tr. 23–24). The radially expandable ring means is forced radially outwardly by means of an axially movable thrust member having a peripheral thrust surface that is symmetrical about the axis of the mandrel and axially inclined relative thereto. (Wiley Tr. 32–36).

9. Three examples of the claimed apparatus are shown in FIGS. 1–2, 5–6, and 9–10, respectively, of the drawings of the Sands-Broome U. S. patent (PX–5A–5C). In FIG. 9 of the Sands-Broome patent drawings, the mandrel is illustrated as being inserted in the end of a length of pipe 1. The mandrel has a "radially expandable ring means" 14 shown in cross-section, that is caused to move radially outwardly and forces the pipe into a split cavity mold 3 to form a circumferential groove in the pipe, as shown in FIG. 10, when the "axially movable thrust member" 12 (illustrated as having a frustoconical shape) is moved axially, i. e., along the axis or imaginary centerline of the apparatus. FIGS. 1–2 of the Sands-Broome patent are similar to FIGS. 9–10, except that in FIGS. 1–2 thrust ring segments 15 are interposed between the ring 14 and the axially movable thrust member. FIGS. 5–6 are similar to FIGS. 1–2 except that in FIGS. 1–2, the ring 14 and thrust ring segments 15 are fixedly secured to the moulding ring, whereas in FIGS. 5–6, an endless spring 19 extends through the thrust segments 15 to bias them inwardly.

A. *Patent Claims.*

10. The Sands-Broome U. S. patent discloses ten consecutively numbered claims including independent claim 1 and claims 2–10, which are directly or indirectly dependent upon claim 1. All of the claims incorporate a mandrel means which can be inserted axially into the end of a length of thermoplastic pipe to form a circumferential internal groove in the pipe. The patent claims are directed to the apparatus, although the specification of the patent states that the invention is directed also to the method of using the apparatus. (PX–1, col. 1, lines 15–16, 26–29, 49–54, and 57–59).

B. *Claims 1, 2, 8 and 9 Disclaimed as Invalid.*

11. Just prior to trial, which began on January 24, 1978, defendant Chemidus on January 20, 1978 disclaimed claims 1, 2, 8 and 9 of the U. S. Sands-Broome patent stating that it "had reason to believe that, without deceptive intent, claims 1, 2, 8 and 9 of said Letters Patent are invalid." (PX–1A, at pp. 1–2).

12. Claims 10 and 3 depend directly upon claim 1, whereas claims 4–7 depend upon claim 3, either directly or indirectly. The claims disclaimed as believed to be invalid and remaining claims are as follows:

*Claims 1, 2, 8 and 9 Disclaimed as Invalid*

"1. In apparatus for forming a circumferential internal groove on a length of piping of tubular thermoplastics material, comprising

split cavity mould means for receiving a pipe, said mould means defining an internal annular cavity into which the wall of the pipe is to be moulded to form the groove;

hollow cylindrical mandrel means for insertion axially into the pipe;

---

**2.** Fred Wiley is an expert in plastic processing and equipment, having 40 years of experience in the industry, who appeared on behalf of plaintiff Robintech.

circumferentially disposed and radially extending ring housing means defined in and extending through the wall of said mandrel means for location in radial alignment with said annular cavity when the mandrel means is inserted into the pipe;

axially movable thrust means mounted within the mandrel means, said thrust means having a peripheral thrust surface symmetrical about the axis of the mandrel means and axially inclined relative thereto;

and radially expandable ring means located and axially confined, in said housing means to encircle said thrust means and communicate in sliding engagement with said thrust surface, said ring means being radially outwardly displaceable from its housing means to deform the pipe into said annular cavity by movement of the thrust means in one sense of axial direction through said mandrel means and ring means.

"2.  In apparatus as claimed in claim 1 wherein said radially expandable ring means comprises a moulding ring the internal surface of which communicates in sliding engagement with said thrust surface.

"8.  In apparatus as claimed in claim 1 and further comprising carrying means axially extending within said mandrel means, said thrust means being slidably mounted on said carrying means and said thrust surface is of conical form co-axial with the axis of the mandrel means.

"9.  In apparatus as claimed in claim 8 wherein said mandrel means comprises a two part structure, each of said parts having a substantially cylindrical external profile and further comprises assembly means by which said parts are co-axially secured together to form said hollow mandrel means and to define said ring housing means, and in which said carrying means extend axially between said parts and is secured to both of said parts to maintain said parts in axial relationship.

*Remaining Claims 10 and 3–7*

"10.  In apparatus as claimed in claim 1 wherein said ring means has an unstressed external diameter not greater than the external diameter of said mandrel means and has an axial length substantially equal to the intended axial length of the groove to be formed in the pipe.

"3.  In apparatus as claimed in claim 1 wherein said radially expandable ring means comprises a moulding ring and thrust ring means, said thrust ring means being located radially between said moulding ring and said thrust surface and communicating in sliding engagement with said thrust surface.

"4.  In apparatus as claimed in claim 3 wherein said thrust ring means comprises a plurality of radially extending thrust sections.

"5.  In apparatus as claimed in claim 4 and further comprising resilient means interconnecting said thrust sections and biasing said thrust sections radially inwardly into engagement with said thrust surface.

"6.  In apparatus as claimed in claim 5 wherein said resilient means comprises an endless spring member and each of said thrust sections defines an aperture which extends therethrough, said apertures cooperating to define a spring housing which extends through said thrust ring means to surround said thrust surface and within which spring housing said endless spring member is housed.

"7.  In apparatus as claimed in claim 3 wherein said thrust ring means is fixedly secured at its outer peripheral surface to the inner peripheral surface of said moulding ring."

13.  Disclaimed claim 1 relates to an apparatus including a hollow cylindrical mandrel which is axially inserted in a pipe and split cavity mould means for receiving the pipe.  An axially movable thrust means is mounted within the mandrel means and has a thrust surface which is symmetrical and axially inclined relative to the axis of the

mandrel. A radially expandable ring means encircles the thrust means and is in sliding engagement with it, and is radially outwardly displaceable so that it can deform the pipe into the annular cavity of the mould thereby forming the groove. (Wiley Tr. 32–38).

14. The difference between disclaimed claim 1 and claim 3 is that the radially expandable ring means is further defined in claim 3 as comprising a moulding ring and a thrust ring means whereby the thrust ring means is in sliding engagement with the surface of the axially movable thrust member. (Wiley Tr. 43). Claim 4 further defines the thrust ring means as being a plurality of radially extending sections, while claim 5 recites a resilient means to bias the thrust sections radially inwardly. (Wiley Tr. 44–45). Claim 6 recites the use of an endless spring to bias the thrust sections radially inwardly. (Wiley Tr. 45–46). Claim 7 provides for the thrust ring means being fixedly secured at its outer peripheral surface to the inner peripheral surface of the moulding ring. (Wiley Tr. 46).

15. Claim 10 depends directly upon disclaimed claim 1 and characterizes the nature of the ring means in claim 1 as to its unstressed external diameter and axial length. Claim 10 reads upon FIGS. 9 and 10 of the Sands-Broome patent and requires no intermediate thrust ring means as does claim 3.

C. *Prosecution of the Sands-Broome Patent Application.*

(1) *Prior Art Patents Cited by Examiner.*

16. The U. S. Patent Examiner who examined the Sands-Broome U. S. patent application cited the following references during its prosecution (PX–1, "References Cited," cols. 7 and 8):

U. S. Patent No. 729,099 to Smith (PX–26A);

U. S. Patent No. 2,458,854 to Hull et al. (PX–26B);

U. S. Patent No. 2,728,127 to Armstrong (PX–26C);

U. S. Patent No. 3,160,920 to Busch (PX–26D);

U. S. Patent No. 3,205,535 to Niessner et al. (PX–26E);

U. S. Patent No. 3,341,894 to Flaming (PX–26F); and

Dutch Patent No. 640,417 (PX–26G–H).

17. As a distinction over the prior art cited by the Examiner, Sands-Broome's U. S. patent solicitor argued in a paper filed April 8, 1969 in the U. S. Patent Office (PX–2, at 7–8 of Amendment):

In considering the several references which have been cited, it is acknowledged that the use of an elastomeric ring or other expandable means to deform a plastic pipe into a mould is broadly known. However, in each such case there is no disclosure of a ring which is radially expandable and displaceable *as a whole by the direct action of a tapered thrust member* which passes through and directly engages with it to impart controlled radial expansion thereto. The claims positively recite this structure. (Patent solicitor's emphasis.)

(2) *Prior Art Patents Not Cited by Examiner.*

18. The Examiner in charge of the Sands-Broome application never cited the following prior art references nor were they otherwise made of record during the prosecution of the Sands-Broome U. S. patent application (Pretrial Order, p. 1):

U. S. Patent No. 3,248,756 to Mills et al. (PX–13);

U. S. Patent No. 2,672,175 to Howard (PX–16);

U. S. Patent No. 1,039,948 to Hunter (PX–19);

French Patent No. 1,389,566 to Pujol (PX–22, 22A).

Likewise, the Examiner never cited U. S. Patent No. 3,425,093 to Ansette (PX–3) during the prosecution of the Sands-Broome U. S. Patent application and thus the Ansette U. S. patent does not appear under the heading "References Cited" in the Sands-

Broome U. S. patent (Modance Tr. 194–95; PX–1, "References Cited," cols. 7–8.[3]

(3) *The Inference that the Ansette U. S. Patent and its Application Were Never Considered by Examiner of the Sands-Broome U. S. Application.*

19. Examiner Stephenson, the Examiner who examined the Sands-Broome U. S. patent application, did not testify at trial. Since Examiner Stephenson did not mention the Ansette U. S. patent or its application in any communication prepared by him during his examination of the Sands-Broome U. S. patent application, it cannot be determined with confidence that he considered the Ansette U. S. patent or the application which matured into such patent, during his examination of the Sands-Broome patent. On the contrary, there is a strong inference that the Examiner never considered the Ansette U. S. patent or its application not only from the fact that he failed to mention them, but also because of the following:

(a) The Manual of Patent Examining Procedure, Section 715.05, specifically requires great care in recording the date upon which a search is made as follows:

"In each action involving a search, the examiner shall endorse on the flap of the file wrapper, the classes and subclasses and publications searched, the date when the search was made or was brought up to date and the examiner's initials, all entries being in BLACK INK. Great care should be taken, inasmuch as this record is important to the history of the application." (Guida Tr. 440).[4]

(b) The only date recorded by Examiner Stephenson regarding a search of prior art patents was "11/4/68" (PX–2, penultimate page under heading "SEARCHED"), which date is prior to the February 4, 1969 date upon which the Ansette U. S. application

became a patent. (PX–3). Thus, the Ansette U. S. patent of February 4, 1969 could not have been among the prior art *patents* he searched on "11/4/68" (Modance Tr. 216).

(c) The only date recorded by Examiner Stephenson regarding an interference search was "7/10/69" which is subsequent to the February 4, 1969 date upon which the Ansette application became a patent (PX–2, penultimate page, under heading "INTERFERENCE SEARCHED"). Since the Ansette U. S. patent was no longer pending as an *application* on "7/10/69", it would not have been located by Examiner Stephenson in his interference search on "7/10/69" (Modance Tr. 216–17).

(d) The number reference "24563/65" and "53609/65" stated as referring to co-pending patent applications in the Sands-Broome U. S. patent application (PX–2 at 2–3) do not identify the country nor inventors to which they refer, and do not refer to a U. S. patent application (Modance Tr. 196–98). Good Patent Office practice requires clarification of such unidentified numbers. (Guida Tr. 445–46). The number "53609/65" is that of British provisional application and is not the application serial number of the Ansette U. S. application. (PX–4). Examiner Stephenson could have, but did not, elicit such information from the Sands-Broome U. S. patent solicitor, who had also prosecuted the U. S. Ansette application. (*cf.* PX–2 and PX–4).

20. The prosecution of the Sands-Broome U. S. patent application was conducted in strict confidence and *ex parte* pursuant to 35 U.S.C. § 122.

### III. *Scope and Content of the Prior Art.*

21. U. S. Patent No. 3,425,095 to Ansette constitutes "prior art" as regards the claims of the Sands-Broome U. S. patent (PX–25A), as do

---

**3.** Walter A. Modance is a former Chairman of the Board of Patent Interferences and Primary Examiner in the U. S. Patent and Trademark Office, now retired, who testified on behalf of plaintiff Robintech as an expert in Patent Office procedure.

**4.** Antonio Guida is a former Patent Examiner, now retired, who testified as an expert on Patent Office procedure on behalf of defendant Chemidus.

U. S. Patent No. 3,248,756 to Mills et al. (PX–13);

U. S. Patent No. 2,672,175 to Howard (PX–16);

U. S. Patent No. 1,039,948 to Hunter (PX–19);

French Patent No. 1,389,568 to Pujol (PX–22, 22A).

(Pretrial Order, pp. 1–2).

A. *Prior Art Shows Radially Expandable Moulding Ring.*

22. The prior art Ansette U. S. patent describes a mandrel for forming a groove in a length of thermoplastic pipe by inserting the mandrel into the end of a heated portion of thermoplastic pipe and radially expanding a radially expandable moulding ring radially outwardly so as to force the heated pipe into a split cavity mold. The moulding ring is then retracted from the freshly formed groove, and the mandrel can now be withdrawn from the pipe. The moulding ring is forced radially outwardly by means of an inner tube filled with air under pressure and itself expanded in order to provide the radial force necessary to expand the moulding ring radially outwardly. (Wiley Tr. 49; PX–9A).

B. *Prior Art Discloses Axially Movable Thrust Member and Spring Biased Thrust Segments.*

23. The prior art U. S. Patent No. 2,672,175 to Howard (PX–16, 17AA–BB, 18A) discloses the axial movement of a thrust member 19, having axially inclined surfaces in slidable engagement with segments 22, which segments are biased radially inwardly by spring 27 and which segments force a radially expandable ring means in the form of a coiled spring member 28 radially outward to expand pipe. Member 28 keeps pipe round (PX–16, col. 3, lines 45–46). The amount by which the radially expandable coiled spring is forced radially outward is determined by the rotation of a bolt 15, which, in turn, moves the thrust member 19 in an axial direction. In this manner, a pipe is expanded radially outwardly in a controlled amount. (Wiley Tr. 62–63, 89–92; PX–17AA–BB).

24. The prior art U. S. Patent No. 3,248,756 to Mills et al. (PX–13, 14AA–BB) discloses the use of an axially movable thrust member 12 for providing radially outward force to a ring of segments 29 in order to expand plastic pipe in a radially outward direction. The axial movement of the thrust member 12 controls the radial movement of the segments, and thus the degree or amount to which the plastic pipe is expanded, so that the expanded pipe can form a socket and receive another pipe as shown in FIG. 1. A set screw 27 may be used to control the extent of axial movement of thrust member 12, and thus the extent to which the segments 29 are radially expanded. (Wiley Tr. 58–60).

25. The principle of using an axially movable thrust member having axially inclined surfaces for imparting a radial force to force a ring of segments radially outwardly and forming a groove in pipe goes back at least to 1912 as shown by prior art U. S. Patent No. 1,039,948 to Hunter (PX–19), wherein an internal groove is formed in pipe by the axial movement of a thrust member 15 having an inclined surface which forces the segments 12 radially outwardly to form a groove. (Wiley Tr. 70–71, PX–20AA).

26. French Patent No. 1,389,566 to Pujol (PX–22 and translation thereof 22A, PX–23A) discloses the use of a device having an axially movable inclined surface for forcing a rubber ring or spring radially outward to form a groove in plastic pipe. (Wiley Tr. 73–74).

IV. *Differences Between the Prior Art and the Claims of the Sands-Broome Patent.*

27. The Ansette U. S. patent discloses the use of a radially expandable moulding ring for forming a groove in plastic pipe by forcing the pipe into a split cavity mould. The main difference between the apparatus described in disclaimed claim 1 of the Sands-Broome patent and the prior art Ansette apparatus is that in the Ansette patent an inflatable tube is used to impart

radial force to the moulding ring, instead of an axially movable thrust means having a thrust surface that is symmetrical about and axially inclined relative to the axis of the mandrel. (Wiley Tr. 79). The prior art Mills et al., Howard, Hunter and Pujol patents all show the conventional use of an axially movable thrust means having a symmetrical and axially inclined thrust surface for imparting force radially outward to a radially expandable ring means. (Wiley Tr. 87; PX-8B).

28. Claim 10 depends directly upon disclaimed claim 1 and recites that the ring means of claim 1 has an unstressed external diameter not greater than the external diameter of the mandrel and has an axial length substantially equal to the intended axial length of the groove to be formed in the pipe. Such features are possessed by the elastomeric moulding ring disclosed in the Ansette patent. (Wiley Tr. 88, PX-3, col. 3, lines 50–56).

29. Dependent claims 3 and 4 of the Sands-Broome patent add to disclaimed claim 1 a thrust ring means (claim 3) in the form of a plurality of radially extending thrust sections (claim 4) between a moulding ring and the surface of the axially movable thrust member. The prior art Howard patent discloses the use of a plurality of radially extending thrust sections 22 between a radially expandable ring 28 and the surface of an axially movable thrust member having axially inclined surfaces. (Wiley Tr. 89–90).

30. Dependent claims 5 and 6 add the use of resilient means (claim 5) in the form of endless spring (claim 6) for biasing the radially extending thrust sections radially inwardly. The prior art Howard patent also discloses the use of an endless spring 27 for biasing thrust sections 22 radially inwardly. (Wiley Tr. 90–92). In claim 7 the thrust ring means is fixedly secured at its outer peripheral surface to the inner surface of the moulding ring. Such feature is shown in the Howard patent whereby the radially expandable member 28 has a lip 29 shown in FIGS. 2 and 3 which fixedly secures the expandable member to the segments 22 at their outer surface. (Wiley Tr. 92).

31. The references cited by the Examiner are less pertinent to the apparatus claimed by the Sands-Broome U. S. patent, than are the prior art patents to Ansette, Howard, Mills et al., Hunter and Pujol. (Wiley Tr. 95). Defendant Chemidus' expert, Don A. Fischer, testified that the Hull patent, which was cited by the Examiner, is the "best reference". (Fischer Tr. 544).[5] However, he testified on cross-examination that "Ansette's moulding ring is closer, probably, to Sands than the moulding 'ring' of Hull" (Fischer Tr. 544), and that the Hull patent does not disclose an axially movable thrust member having an inclined surface (for moving) something out radially. (Fischer Tr. 568). Howard discloses an axially movable thrust member having an inclined surface for moving a ring member out radially, as does Pujol.

32. The effective date for determining the level of ordinary skill as to claims 3–5, 7 and 10 is May 25, 1966, since that is the date of the British provisional application upon which Chemidus relies in the Sands-Broome U. S. application for priority under 35 U.S.C. § 119. However, the effective date for claim 6 is the May 5, 1967 filing date for the U. S. Sands-Broome patent, since the endless spring feature of such claims is not disclosed in the British provisional application. (Pretrial Order, p. 2).

V. *Level of Ordinary Skill in the Art.*

33. The level of ordinary skill in this art was substantial prior to early 1966. Such person having ordinary skill in the art of expandable mandrels for expanding pipe, who would have been assigned the task of designing the type of device described in the Sands-Broome patent, would have an education ranging from that of a mechanical engineer with a college degree to an individual having technical training in statics, mechanics and tool design (e. g., a junior college or technical school education).

---

5. Don A. Fischer testified on behalf of defendant Chemidus as an expert.

His work experience would range from three to five years in designing equipment for the production of plastic pipe. He would be familiar with how certain forces deform certain materials and would be knowledgeable in the mechanics of how motions are translated across different members. Also, he would know the principles involved in providing an axially movable thrust member to cause something to move radially outwardly. (Wiley Tr. 96–97; Suh Tr. 123–24 [6]; dePutter Tr. 344–45 [7]).

### VI. Claims of Sands-Broome U. S. Patent Constitute Combination of Known Elements Which Produces no Synergistic Effect.

34. Most of the claimed elements of the Sands-Broome device are found in one of the prior art Ansette and Howard patents. The Mills et al., Hunter and Pujol patents also disclose such elements. (Suh Tr. 110). Additionally, each element which corresponds to the elements of the claims of the Sands-Broome patent performs the same direct, specific function as the corresponding element in the prior art patents. (Suh Tr. 110–11).

35. An axially movable thrust member for imparting radial motion is found in the Mills et al., Howard, Hunter and Pujol patents and corresponds to the Sands-Broome axially movable thrust member. A thrust ring member corresponding to that claimed in the Sands-Broome claims is found in Howard as is a spring for biasing thrust ring segments radially inwardly. The split cavity mould and moulding ring for forming a groove in plastic pipe of the Sands-Broome patent claims are found in Ansette. The thrust ring means and the inner surface of the Howard ring are fixedly secured. (Suh Tr. 111–14).

36. The combination of elements of claims 3–7 and 10 of the Sands-Broome patent do not produce any surprising or synergistic result. Any advantages realized by such combination of old and known elements would merely result from the conventional substitution of elements from positive displacement devices, such as the axially movable thrust member-type elements of the Howard, Mills et al., and Pujol devices for imparting radial motion for a corresponding force control element as the expandable inner tube of Ansette.

37. Witnesses on behalf of defendant Chemidus testified that the Sands-Broome device provided an advantage with thick pipe as to accuracy of the groove as compared with the Ansette device (Sands Tr. 364–65 [8]; Fischer Tr. 574–75), including pipe having a thickness of 1–2 inches and pipe having a little more than five-eighths of an inch thickness. (Fischer Tr. 575). In the file wrapper history of the Ansette U. S. patent application assigned to defendant Chemidus, the U. S. patent solicitor for applicant argued to the Patent Office in a paper filed May 1968, that with the Ansette device:

> In the formation of an internal groove in a pipe socket for the location of a sealing ring it is essential—if the sealing ring is to be efficient during operation—that the groove is accurately formed and symmetrically located. If the groove is not so formed, incorrect sealing pressures are possible and the joint between a socket and its mating pipe spigot can leak. * *

The argument continues

> * * * considerably improved definitions or profile of the internal groove is obtained particularly when applying the invention to thick walled pipes, say, from $\frac{1}{8}$ to 3 inches and above. * * *

(Fischer Tr. 578–79 quoting PX–4 paper dated May 8, 1968, pp. 6–7).

---

**6.** Professor Nam P. Suh is head of the Mechanics and Materials Division of the Department of Mechanical Engineering at M.I.T. who testified as an expert on behalf of plaintiff Robintech.

**7.** Warner Jan dePutter from 1966 to 1968 was head of Development Department of Industriele Onderneming Wavin N.V., defendant's parent company.

**8.** David Harold Sands is a joint inventor of the Sands-Broome patent who testified on behalf of defendant Chemidus.

38. The specification and claims of the Sands-Broome U. S. Patent (PX–1) makes no reference as to the size of pipe in which the groove is to be formed or any advantages as to groove formation in thick pipe. (Sands Tr. 383).

39. In determining the issues in this case including that of "obviousness" under 35 U.S.C. § 103, the Court of Appeals for this Circuit has expressed a preference for relying upon the testimony of experts skilled in the particular art to which the subject matter of the patent pertains. *Scandiamant Aktiebolag v. Commissioner of Patents,* 166 U.S.App.D.C. 130, 133, 509 F.2d 463, 466 (1974). Plaintiff Robintech relied on the expert testimony of Fred Wiley and Professor Nam Suh. Mr. Wiley worked for 40 years in the plastics industry and was engaged in the design and construction of machinery, tooling and equipment for processing plastics into articles including pipe. Additionally, he has 33 U. S. patents in the area of thermoplastics and engineering developments in the plastics industry. (Wiley Tr. 15). Professor Suh is head of the Mechanics and Materials Division of the Department of Mechanical Engineering at M.I.T., possesses B.S., M.S., and Ph.D. degrees in mechanical engineering, and has authored numerous books and articles relating to processing of plastics. (Suh Tr. 106; PX–35). Moreover, in 1958 he worked as a machine designer for processing plastic into tubes by radial expansion. (Suh Tr. 128). Defendant Chemidus' expert, Don A. Fischer, testified as an expert in the field of engineering and patent law to interpret patent claims and disclosure. (Pretrial Order, p. 3e). With a legal background and extensive experience in electrical and industrial engineering, he presented expert testimony, as did plaintiff's experts, on the state of prior art antedating the application for the Sands-Broome patent.

40. The evidence of record is inconclusive concerning the importance of specifying hardness requirements for the moulding ring and whether the failure to disclose or mention such requirements constitutes a failure to set forth the "best mode contemplated by the inventor for carrying out his invention."

41. Clause 1(d) of the licensing agreement between the parties (PX–30) restricts the export by plaintiff of products manufactured by means of the patented apparatus, the products themselves being unpatented. *See* Memorandum Order on Patent Misuse of March 22, 1978 at 3–5.

## Conclusions of Law

### I. Patent Validity.

#### A. Presumption of Validity.

1. A patent is presumed valid and the burden of proving invalidity is upon the party asserting it. 35 U.S.C. § 282. However, the statutory presumption of validity is weakened, if not destroyed, when pertinent prior art had not been considered by the Patent Office. *Globe Linings, Inc. v. City of Corvallis,* 555 F.2d 727, 729 (9th Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977); *Filmon Process Corp. v. Spell-Right Corp.,* 131 U.S.App.D.C. 374, 376, 404 F.2d 1351, 1353 (1968); *Noma Lites Canada Ltd. v. Westinghouse Electric Corp.,* 399 F.Supp. 243, 252 (D.D.C.1975). It has been held that the failure to cite even one prior art reference overcomes the statutory presumption of validity. *Turzillo v. P & Z Mergentime,* 174 U.S.App.D.C. 318, 324, 532 F.2d 1393, 1399, *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1976). In the instant case, the failure of the Patent Examiner to cite the prior art patents to Ansette, Howard, Mills et al., Hunter and Pujol undermines the statutory presumption normally attaching to the Sands-Broome patent.

2. Moreover, the presumption of validity of a patent as to any prior art patent is met where there are no official actions or papers of the Examiner from which it confidently may be inferred that he ever acquired actual knowledge of the subject matter of that prior art patent, even if such patent is mentioned in the specification of the patent in suit. *See Ceco Corp. v. Bliss & Laughlin Industries, Inc.,* 557 F.2d 687, 691 (9th Cir. 1977). In the instant case, the U. S. patents

to Ansette, Mills et al., Howard, Hunter and Pujol were never cited in any official actions or papers of the Examiner which are part of the record and there is no testimony of the Examiner himself who examined the Sands-Broome U. S. patent application. The presumption of validity of the Sands-Broome U. S. patent is further weakened.

3. The admission by defendant Chemidus shortly before trial that claims 1, 2, 8 and 9 are believed to be invalid further weakens any presumption of validity as to the dependent remaining claims.

### B. *Obviousness.*

4. A patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

5. The criteria for determining obviousness or nonobviousness under § 103 were set out by the Supreme Court as follows:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; *and the level of ordinary skill in the pertinent art resolved.*" (emphasis supplied)

*Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).[9] The prior art Ansette patent discloses a mandrel for forming a circumferential groove in thermoplastic pipe by forcing a moulding ring radially outwardly, which, in turn, forces the pipe into a split cavity mold. The difference between the apparatus disclosed in the Ansette patent and that recited in claims 3–7 and 10 of the Sands-Broome patent consists of the means used to force the moulding ring radially outwardly. Such means comprise an axially movable thrust means, alone, or in combination with thrust ring segments for imparting a radially outward force, as well as a spring for biasing the segments inwardly, which means are taught by the prior art Howard patent to be conventional. The prior art Mills et al., Hunter and Pujol patents further disclose such axially movable thrust means, which have an axially inclined surface for imparting a radial force, to be conventional. The substitution of such conventional means for imparting radial force to the the moulding ring of Sands-Broome would have been obvious to a person having ordinary skill in the art of expanding mandrels for expanding pipe prior to early 1966, particularly since the level of ordinary skill in this area is substantial.

6. In applying the obviousness test of § 103 in order to determine the validity of a patent, the inventor is pictured working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him. *Filmon Process Corp. v. Spellright Corp.,* 274 F.Supp. 312, 313 (D.D.C.1967), *aff'd* 131 U.S.App.D.C. 374, 404 F.2d 1351 (1968). In considering the disclosures of prior art references, the obviousness may properly be based on a combination of references or on the prior art as a whole, and not only the specific teachings of a reference. The inferences which one skilled in the art would draw therefrom should also be considered. *Parker v. Motorola, Inc.,* 524 F.2d 518, 532 (5th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). The claimed apparatus of the Sands-Broome patent would be obvious to one having ordinary skill in the art of designing expandable mandrels for expanding pipe having the prior art patents to Ansette and Howard hanging on his walls around him. The disclosures of the Mills et al., Hunter and Pujol patents further support this conclusion.

9. It is noted that the Supreme Court in *Graham v. John Deere Co.* mentioned "secondary considerations" including commercial success of the claimed invention. Defendant Chemidus did not demonstrate such secondary considerations. Moreover, counsel for defendant Chemidus stipulated that defendant would not attempt to show commercial success. (Pretrial Order, p. 4; Broome deposition, p. 139).

7. The § 103 test of non-obviousness in cases where a combination of known elements is involved is heavy and burdensome because of the difficulty and improbability of finding an inventive contribution from the combination of known elements. Something significant must be added by the combination to the total stock of knowledge. Each element must produce in combination with the other elements a surprising or synergistic result, i. e., one which is not simply new but one which would not normally follow as a matter of course from the assembly of old elements, and without which no amount of practicality, usability or success can transform the relocation and sizing of old elements into elements of a patentable combination. *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281–82, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152–53, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Blair v. Dowd's, Inc.,* 141 U.S.App.D.C. 295, 296, 438 F.2d 136, 137 (1970) (per curiam); *Noma Lites Canada Ltd. v. Westinghouse Electric Corp.,* 399 F.Supp. 243, 253 (D.D.C.1975); *Windmoller v. Laguerre,* 289 F.Supp. 178, 182 (D.D.C.1968). The elements of the device of claims 3–7 and 10 of the Sands-Broome U. S. patent are each found in the prior art patents to Ansette, Howard, Mills et al., Hunter and Pujol, and each such element performs its usual function therein. It has not been demonstrated that the claimed combination of elements produces any surprising or synergistic result. On the contrary, the result realized is that which normally follows from the substitution of conventional elements and their function.

8. Even if there are advantages of the Sands-Broome device as compared with prior devices, such advantages must be recited in the claims of the Sands-Broome patent in order for defendant Chemidus to rely upon such advantages for the purpose of establishing patentability. Inherent attributes which are not in the claims may not be relied upon by the patentee to distinguish the claims of the patent in suit over the prior art. *Bourns, Inc. v. Dale Electronics, Inc.,* 308 F.Supp. 501, 505 (D.Neb.1969) *citing National Connector Corp. v. Malco Mfg. Co.,* 392 F.2d 766, 769 (8th Cir.), *cert. denied,* 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968). Although defendant Chemidus contends that there are advantages realized using the Sands-Broome apparatus with thick pipe in particular, such advantages were not disclosed or claimed in the Sands-Broome patent specification. The claims of the Sands-Broome patent do not limit the use of the claimed apparatus to thick pipe. (Sands Tr. 383). The alleged advantages attributed to the Sands-Broome device appear to be identical to the advantages possessed by the device of the prior art Ansette patent as contended by defendant Chemidus' own U.S. patent solicitor during the prosecution of the U. S. Ansette patent application. (PX–4, Fischer Tr. 578–80).

9. Claims 3–7 and 10 of the Sands-Broome U. S. Patent are held to be obvious and the Sands-Broome U. S. patent, comprised of said claims, to be invalid pursuant to the provisions of 35 U.S.C. § 103.

10. The export restriction imposed on plaintiff in clause 1(d) of the license agreement between the parties (PX–30) represents an attempt to control the distribution of products not covered by defendant's patent, thereby expanding defendant's patent monopoly beyond its lawful scope, and constitutes misuse of the patent. Memorandum Order on Patent Misuse of March 22, 1978 at 3–5. The remedy for such misuse is that the patentee may not use the courts to enforce its rights under the patent until the misuse is purged. *W. L. Gore & Assocs., Inc. v. Carlisle Corp.,* 529 F.2d 614, 622 (3d Cir. 1976); *Ansul Co. v. Uniroyal, Inc.,* 306 F.Supp. 541, 560 (S.D.N.Y.1969), *aff'd* 448 F.2d 872 (2d Cir. 1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). Applied to the circumstances here, this principle mandates denial of defendant's counterclaim for royalties for the period January 1, 1970 to June 30, 1975. Further, the license agreement remains unenforceable against plaintiff so long as defendant attempts to employ its

rights under the United States patent[10] to impede plaintiff's export of unpatented products.

11. Plaintiff's counterclaim against defendant for defendant's alleged failure to supply certain technical information or "know-how" is likewise denied. The "know-how" component of the parties' licensing agreement survives the determination that the underlying patent is invalid, and is potentially segregable from the royalty component thereof. That the "know-how" provisions of the licensing agreement cannot avert a determination of patent misuse, (Memorandum Order on Patent Misuse of March 22, 1978 at 5), does not foreclose the possibility that the "know-how" provisions may have continued vitality wholly apart from the patent in suit and the parties' rights and obligations thereunder, and thus may be independently enforceable. To prevail on its counterclaim, plaintiff was required to demonstrate that it had satisfied its obligations with respect to payments under the "know-how" provisions, and it has not done so.

12. The questions of fact and law herein were sufficiently close and difficult, and the decisions on the several issues herein sufficiently divided between the parties, to warrant a discretionary refusal to assess costs in favor of the prevailing party, Rule 54(d) of the Federal Rules of Civil Procedure notwithstanding. *See United States Plywood Corp. v. General Plywood Corp.,* 370 F.2d 500, 508 (6th Cir. 1966); *Kalkowski v. Ronco, Inc.,* 424 F.Supp. 343, 354 (N.D.Ill. 1976). Finally, this is not the "exceptional" case in which an award of attorney fees is justified. 35 U.S.C. § 285.

An Order consistent with the foregoing Findings of Fact and Conclusions of Law has been entered this day.

---

10. Whether defendant's foreign patents for the same apparatus can be used to restrict importation of plaintiff's products to the nations in question is not before us for decision.